### In re MORGAN et al.

(Circuit Court of Appeals, Second Circuit. June 2, 1920.)

No. 228.

1. **Bankruptcy ⚡407(5)—False statement to obtain credit which will bar discharge.**

A false statement on which a bankrupt obtained money or property on credit, which will bar his discharge, under Bankruptcy Act, § 14b, subd. 3 (Comp. St. § 9598), must be a financial statement, as distinguished from a mere misrepresentation.

2. **Bankruptcy ⚡407(5)—Fraudulent contracting of debt not bar to discharge.**

A discharge does not release a bankrupt from debts fraudulently contracted, and it was not intended that he should be refused discharge from all of his debts, because he may have contracted one or more fraudulently.

3. **Bankruptcy ⚡407(5)—Discharge; "obtaining money or property on credit."**

That purchasers of stock in a newly formed corporation organized by bankrupts instead of the stock, were given receipts which entitled them to certificates of stock when issued, held not to constitute the obtaining by bankrupts of money or property on credit, within the meaning of Bankruptcy Act, § 14b, subd. 3 (Comp. St. § 9598).

4. **Bankruptcy ⚡407(5)—"Obtained money or property on credit on a materially false statement" as ground for denial of discharge construed.**

The phrase "obtained money or credit on a materially false statement," as used in Bankruptcy Act, § 14b, subd. 3 (Comp. St. § 9598), stating ground for denial of discharge, was intended to require the falsity to be tested as to its materiality to the obtaining of credit.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Obtaining Credit on False Statement.]

Appeal from the District Court of the United States for the Southern District of New York.

In the matter of Morgan, Truett & Co., a partnership, and Daniel H. Morgan, Edward P. Truett, and Frederick H. Hovey, individually, bankrupts. On appeal by Daniel H. Morgan and Edward P. Truett, from an order denying them discharge. Reversed.

Rabenold & Scribner, of New York City (Allan R. Campbell, of New York City, of counsel), for appellants.

Arthur F. Gotthold, of New York City (Arthur F. Gotthold and Meyer Boskey, both of New York City, of counsel), for appellee Miner.

Hunt, Hill & Betts, of New York City (George C. Sprague, of New York City, of counsel), for objecting creditor.

Before WARD, ROGERS, and MANTON, Circuit Judges.

MANTON, Circuit Judge. On April 24, 1918, the stock brokerage firm of Morgan, Truett & Co. was adjudicated a bankrupt. The individual partners, Daniel H. Morgan, Edward P. Truett, and Frederick H. Hovey, were also adjudicated bankrupts. They applied for their discharge, and in April and May, 1919, objections to their discharge were filed. The action of the District Court resulted in the discharge of Frederick H. Hovey; the appellants were denied their discharge. The objections to the discharge, which were sustained by the District Court, specified that the appellants obtained money or property on credit upon a false statement made for the purpose of obtaining credit.

The claim of obtaining money or property on credit is based on three transactions in the sale of stock. Morgan and Truett acted as organization managers of the Iowa Securities Company, a corporation formed in 1915. Morgan and Truett contracted to buy, for $108,000, blocks of stock of the Iowa State Savings Bank and the Farmers' Live Stock Loan Company from Mr. Montgomery, who was the president of each company. The savings bank was paying dividends on its stock. The live stock company was loaning money to Western cattle raisers upon their notes, with chattel mortgages upon the cattle. It, too, was making profits. Morgan and Truett organized the Iowa Securities Corporation, intending it to be a holding company to take the stock of the bank and that of the live stock company, intending to turn over all the stock to it. The corporation issued $125,000, par value, preferred stock, and a like amount of common stock. The stock was offered for sale on the basis of $110 for a share of preferred, together with a quarter share or half share of common. It was intended to use the money secured in the sale of the Iowa Securities Company stock to make good on the contract with Montgomery, thus paying for the stock of the savings bank and the live stock company. Morgan and Truett had obligated themselves to Montgomery for the payment of these stocks. This plan of financing and of doing business was carried out to the extent indicated, and then the Iowa Securities Corporation stock was offered for sale. It resulted in the three transactions with which we are concerned in the determination of the issues here.

In April, 1917, at the organization meeting of the Iowa Securities Corporation, the offer of the firm to transfer to the corporation the blocks of stock of the bank and loan companies was accepted, and the officers of the corporation were authorized by resolution to issue to Morgan, Truett & Co. certificates for the stock of the corporation on receiving the securities also offered. The securities were still in the name of Morgan and Truett, and were still held as collateral by the

banks, which had loaned the balance of the purchase price, and therefore Morgan and Truett were not in a position to vest the title of these stocks in the Iowa Securities Corporation. A prospectus was then issued, which, among other things, falsely stated that the stock of the Iowa Securities Corporation was issued to pay for $40,000, par value, of the capital stock of the Farmers' Live Stock Loan Company, and that the Iowa Securities Corporation owned 40 per cent. of the Iowa State Savings Bank, with earnings of about 25 or 50 per cent. of the stock, and of the Farmers' Live Stock Loan Company, with earnings of about 24 per cent. The truth was that the stock of these two financial institutions was in their own name, and was never transferred to the Iowa Securities Corporation, and this latter company had no assets at any time, except the contract with Morgan, Truett & Co.

On February 13, 1917, Mrs. Mary E. Wilson subscribed to 30 shares of preferred stock of the Iowa Securities Corporation and received a subscription receipt reading as follows:

"No. 17.　　　　　　　Subscription Receipt.　　　　　　　30 Shares.
"Iowa Securities Corporation.
"Incorporated Under the Laws of the State of New York.

"The undersigned hereby acknowledge the receipt from Mrs. Mary E. Wilson of the sum of $3,300 in full payment for subscription to thirty shares of the full-paid 6% cumulative preferred capital stock of the Iowa Securities Corporation.

"After engraved stock certificates have been prepared, the holder of this receipt, upon surrender hereof, duly indorsed, at the office of the undersigned, will be entitled to receive a certificate for the said preferred stock and a certificate for three shares of the full-paid common stock of the said corporation for every ten shares of preferred stock represented by this certificate.

"Dated Feb. 13, 1917.
　　　　　　　"Morgan, Truett & Co., Organization Managers,
　　　　　　　　　　　　"40 Wall Street, New York City.
　　　　　　　"[Signed]　Morgan, Truett & Co.,
　　　　　　　　　　　　　　　"By E. P. Truett."

Prior to her purchase, she received a copy of the prospectus above referred to. She read these circulars before making the purchase, and made no separate investigation as to the securities. While the circular was received from the brokerage firm of Henry & Shirley, still it was used and reprinted over Morgan & Truett's name, and was printed by permission of Morgan, Truett & Co. for use in selling stock. Later on, Morgan, Truett & Co. sent a letter inclosing a check for 6 per cent. interest on the preferred stock. The court below approved the finding of the referee that the statement that the stock was issued to pay for the stock mentioned was false.

On January 7, 1918, Mrs. Wilson exchanged $4,000 worth of bonds of the Poplar Lumber Corporation for 40 shares of stock of the Iowa Securities Corporation. A week later a similar subscription receipt was sent Mrs. Wilson. Victor E. Gartz gave an order for 10 shares of stock and received a subscription receipt. A letter was sent with the subscription receipt to Mr. Gartz's office. He then gave his check in payment and received the receipt. At no time was a stock certificate issued to either Mrs. Wilson or Mr. Gartz.

The contention of the appellees is that the bankrupt obtained money on credit on a materially false statement in writing, which was made to both Mrs. Wilson and Mr. Gartz. The false statement is said to be contained in the representation of ownership of the underlying securities and the promise by the organization managers to deliver stock in the future. The statute (section 14b, subd. 3, of the Bankruptcy Act [Comp. St. § 9598]) provides that the judge shall discharge, unless the bankrupt has obtained money or property on credit on a materially false statement in writing for the purpose of obtaining credit from such person.

[1] The argument of the appellee seems to be that the bankrupts obtained money upon the statement referred to; that they thereby obtained credit, and thereafter they obtained the money on credit upon the statement. But the language of the statute limits the refusal to discharge to obtaining money or property on credit upon a materially false statement in writing by him to any person or his representative for the purpose of obtaining credit from such person. It is plain that the intention of Congress was to extend not the statute to all cases of false written statements where credit happens to be given, and the thought being to confine the statute to cases where the decision to give credit was induced by the false statement. Such statement must be a financial statement, as distinguished from a mere misrepresentation.

[2] A debt fraudulently contracted by the bankrupt will not be released by his discharge. Therefore the debts in question, which the court below found were contracted fraudulently, may fall within this provision of the act. Congress, however, never intended to refuse a bankrupt his release from all of his debts because he had contracted one or more fraudulently. The phrase "for the purpose of obtaining credit" contemplates a statement fitted to such purpose. It is intended to mean "to obtain money or property on credit." Each of the phrases in the statute must be given its appropriate meaning. The phrases "on credit" and "for the purpose of obtaining credit" should not be treated as redundant. The phrase "upon a materially false statement" follows immediately after "on credit," and therefore it is apparent that Congress intended to qualify the whole clause, to "obtain money or property on credit." We think it was intended to mean that the credit obtained upon a materially false statement required the falsity to be tested as to its materiality to the obtaining of the credit.

[3] The statute, in using both terms, is limited to statements made for such a purpose. Morgan, Truett & Co. and Mrs. Wilson and Mr. Gartz, the creditors, contracted for the purchase of stock. It is true there was no delivery of the certificate of stock, but there was a receipt given. It was a present purchase. The stock certificate was agreed to be delivered after preparation of engraved certificates. This did not make it an executory transaction. The sale was completed upon the signing of the contract and delivery of the subscription receipt. A discharge in bankruptcy is refused when the bankrupt has made false written statements as to his financial standing and thereby obtained money or property from any one relying on the statement. Fire-

stone v. Harvey, 174 Fed. 574, 98 C. C. A. 420; In re Bleyer, 215 Fed. 896, 132 C. C. A. 236.

In refusing a discharge, the court should never take into consideration the conduct or misstatements which could never have had anything to do with the extension of credit; nor do we think that Mrs. Wilson or Mr. Gartz were induced by anything contained in the statement to make the purchase. The testimony, of both shows that, if anything they were misled in investing, and that they were not misled into giving credit. Mrs. Wilson says she did not rely upon any false statement of the appellants, or of the corporation's financial standing. She accepted the receipt and treated it as a consummated sale of stock. She said she relied upon the fact that she had already received a dividend when she bought the second block of stock. Mr. Gartz says that his interest was in learning about the financial responsibility of the brokerage house. He said he thought that, if the brokerage house came up to the standard of probity and honesty that the agent, Henry, gave them, they would not take anything which was "fishy."

[4] There is nothing in the record indicating that, at the time either of the investors made their decision to invest, the taking of a subscription receipt rather than a stock certificate was contemplated, or even suggested. Nor is there any evidence indicating that the investors had in mind a distinction between a subscription receipt and the stock certificate. Nor does the evidence indicate that the statements made, and now complained of as false, could have influenced the investors to disregard this difference. It may be that the bankrupts obtained money upon the statement. They did not, however, obtain credit upon the statement, and therefore did not obtain money on credit upon the statement. The Bankruptcy Act limited the cases where so severe a penalty is inflicted as a refusal to grant a discharge from the bankrupt's provable debts upon the objection of a creditor to moneys or property obtained on false statements made for the purpose of obtaining credit. It is intended that acts done prior to the bankruptcy proceeding, which amount to a fraud on the system of commercial credit, shall be regulated by the Bankruptcy Law, such as falsification, destruction or omission to keep books of account; the obtaining of credit by fraud; the transfer or concealment of property in fraud of creditors prior to the bankruptcy.

The bankruptcy proceedings here were brought against the brokerage firm, because of its failure in that business. The transaction of Morgan and Truett respecting Iowa Securities Corporation was carried on by them in a separate enterprise, with which the stock exchange firm had nothing to do. No act done by them in their stock exchange business is alleged in opposition to their discharge. They are denied a discharge for misconduct in an outside matter, which was not essentially connected with their obtaining of credit, and nothing whatever to do with their bankruptcy. If it is immaterial whether the question of giving credit was considered at all by the creditors defrauded, then it should make no difference in the application of the statute whether the credit given is intended or unintended; for, if that be so, then the statute extends to any extension in which the bankrupt obtains money

or property on a false written statement. A person who thus parts with his money is left with an unsecured claim against the bankrupt, whether in contract or for deceit, and has fraudulently or otherwise given him credit.

To give the construction of the statute as contended for by the appellees, the words "upon credit" in the statute must be deemed superfluous. We think Congress intended that the bankrupt should be discharged, unless the statutory grounds of objection to the discharge are made out clearly. We are satisfied that the sale was not obtained by a materially false statement in writing, within the meaning of the act, and we fail to perceive any sufficient ground for refusing the discharge of the appellants. It would be at variance with the general policy of the bankruptcy court to deny the discharge under the proof here.

The order is reversed, and the District Court directed to grant a discharge.